UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTIAN SIMPSON | ) | CASE NO.  1:20-cv-02478 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) | |
| | ) | |
| PTL. SHANE RIVERA, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Before the Court is the motion for summary judgment (Doc. No. 27) filed by Defendants

Shane Rivera, Roosevelt Linder, Sam Thirion, Jason Mausar, and Donna Holden.  Plaintiff

Christian Simpson opposed this motion (Doc. No. 38), and Defendants filed a reply brief in

support (Doc. No. 40).  For the reasons that follow, Defendants' motion for summary judgment

is GRANTED, and this case is dismissed.

## I.  Background

### A.  Undisputed Facts

The facts of this case are largely undisputed.

#### 1. EPD responded to a water leak.

On July 6, 2020, David Johnson reported a water leak in his basement.  (Police Report,

Doc. No. 16-1 at 161.)[1]  The Euclid Fire Department dispatched three firefighters, Lt. Bryan

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document
and PageID#, rather than any internal pagination.

1

Banning, Tom Kander, and Dave Engeman (collectively, "EFD"), to Johnson's residence.  (EFD Report, Doc. No. 27-2 at 390; Banning Dep., Doc. No. 27-1 at 384.)[2]

Johnson met EFD outside and briefly explained that an active water leak in his basement appeared to be coming through the shared wall of his side-by-side duplex.  (Doc. No. 27-1 at 370.)  Johnson's duplex neighbor was Plaintiff Christian Simpson.  (*Id.* at 370-72.)  Johnson explained to Banning that he previously communicated with Simpson about this leak but was unable to resolve the issue.  (*Id.*)

Johnson took Banning down to his half of the basement.  (*Id.* at 371.)  Banning saw water penetrating the cement wall and cascading down, which he later described as "[s]imilar to a waterfall coming down the wall."  (*Id.* at 371-72.)  The water was pooling on the basement floor.  (*Id.* at 373.)

EFD believed Simpson was present in his home and knocked on his front and back doors to make contact with him.  (Doc. No. 27-2 at 389.)  They received no response and concluded that he "was refusing to answer [his] door."  (*Id.*; *see also* Engeman Dep., Doc. No. 27-4 at 403; Kander Dep., Doc. No. 27-3 at 392; Doc. No. 27-1 at 374.)  Banning contacted his Platoon Chief, Jay Womack, to see if the Euclid Police Department ("EPD") would help them contact Simpson.  (Doc. No. 27-1 at 375.)  Womack reached out to EPD for assistance.[3]  (Doc. No. 36 at 695.)  EFD waited in the duplex's front yard until EPD arrived.  (*Id.*)  During their wait, Simpson's side of the duplex remained silent with no activity observed by EFD.  (*Id.* at 696.)

---

[2] EFD did not activate lights or sirens.  (Doc. No. 27-2 at 390.)

[3] According to EFD's Report, the call out for EPD was as follows: "Needs officers – male is refusing to answer door for FD – He [h]as water coming into neighbors home – possible domestic issue."  (Doc. No. 27-2 at 389 (original capitalized).)

## 2. EPD arrived and detected natural gas odor.

Dispatch directed EPD to assist EFD with a "possible domestic" at the duplex.  (Doc. No. 27-2 at 389; *see also* Mauser Dep., Doc. No. 32 at 517; Rivera Dep., Doc. No. 30 at 429.)  EPD Officers, including Defendants Shane Rivera, Samuel Thirion, Jason Mauser, and Roosevelt Linder (collectively, the "Officers"), responded separately.  (Doc. No. 16-1 at 163.)[4]  Neither lights nor sirens were activated on any of the patrol cars.  (Doc. No. 30 at 428; Thirion Dep., Doc. No. 31 at 469; Doc. No. 32 at 521.)

Upon arrival, EFD debriefed the Officers on the situation.  (Doc. No. 30 at 432-33; Doc. No. 32 at 529.)  The Officers knocked on Simpson's front and back doors and failed to get a response.  (Doc. No. 32 at 534; Roosevelt Dep., Doc. No. 33 at 589.)  Officer Roosevelt called dispatch to assist in identifying the owners of the vehicles parked in Simpson's driveway.  (Doc. No. 33 at 589.)  Neither vehicle belonged to Simpson, and the owners did not answer their phones.  (*Id.* at 589-90.)

At some point, while standing near Simpson's backdoor, both the Officers and EFD noticed the smell of natural gas.  (Doc. No. 27-1 at 376-77; Doc. No. 27-3 at 394; Doc. No. 27-4 at 404.)  EFD immediately notified Johnson of the need to evacuate his half of the duplex.  (Doc. No. 16-1 at 157; Banning Dep., Doc. No. 36 at 703.)  Banning used a specific meter to determine

---

[4] Simpson's Amended Complaint included the following allegation: "Defendants falsif[ied] [their] incident reports in an effort to justify their unlawful entry into [his] home and unlawful seizure of [him]."  (Amended Complaint, Doc. No. 14 at 129.)  Simpson did not reiterate this allegation in his opposition brief, nor did he provide any record citation to support this assertion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (noting on summary judgment, the non-moving party must do more than simply rely on assertions made in the pleadings.)  The Court must therefore disregard this allegation.  That said, no material factual determination made herein rests solely upon the incident reports.

if the smell was, in fact, natural gas.  (Doc. No. 27-1 at 377; Doc. No. 27-3 at 395.)  The meter did not register the presence of natural gas.  (Doc. No. 27-1 at 378.)

### 3. EFD determined that they needed to enter Simpson's home with EPD's assistance.

Still unable to reach Simpson – and unable to reconcile their sense of smell with the meter reading – the Officers and EFD discussed entering the residence.  (Doc. No. 33 at 595; Doc. No. 27-1 at 380.)  The Officers and EFD separately contacted their respective supervisors for direction on whether a forced entry was permissible.  (Doc. No. 27-1 at 381; Holden Dep., Doc. No. 34 at 653.)

Banning contacted Womack again.  (Doc. No. 27-1 at 381.)  Banning felt that "there's no reason why [Simpson was] not coming to the door after multiple attempts over a long period of time by both the fire department and police department."  (*Id.* at 383.)  Accordingly, Banning felt there was a possibility that Simpson was having a medical emergency or was in physical danger.  (*Id.*)  Womack advised Banning to give Simpson more time to respond.  (*Id.* at 381.)  After some time had elapsed, Womack instructed Banning to "go ahead, force entry, but do it with minimal damage."  (*Id.* at 382.)  Banning requested an ambulance so that medical services would be immediately available if entry confirmed that Simpson was in distress.  (*Id.*)

Officer Rivera radioed his supervisor, Defendant Lt. Donna Holden.  (Doc. No. 34 at 653.)  Officer Rivera explained to Lt. Holden that he was dispatched to help EFD with a "possible domestic."  (*Id.* at 654.)  He also told her that after arriving he and other officers on the scene learned that EFD could not reach Simpson to address a water leak issue.  (*Id.*)  Consistent with his conversations with EFD, Officer Rivera advised Lt. Holden that EFD felt a "safety sweep" was necessary to ensure the safety of EFD.  (*Id.* at 655.)  Neither the Officers nor Lt. Holden believed that the circumstances required *EPD* to make a warrantless entry.  (Doc. No. 34

4

at 655; Doc. No. 30 at 437; Doc. No. 33 at 594.)  Nonetheless, if EFD determined that their call out required a secured, forced entry to inspect and eliminate any possible threat relative to the water and natural gas leaks, they could assist to that point.  (Doc. No. 16-1 at 161; Doc. No. 33 at 596-97.)

EFD reiterated their need to enter the residence.  (Doc. No. 33 at 596-97; Doc. No. 27-1 at 383.)  They also confirmed that, given the circumstances, they would not do so without EPD first ensuring it was safe for EFD to enter.  (Doc. No. 27-2 at 390; Doc. No. 27-1 at 385; Doc. No. 33 at 597-98.)

### 4. EPD and EFD forced entry into Simpson's home.

Under Banning's supervision, Kander and Engeman removed Simpson's backdoor doorknob using a screwdriver and a hammer.  (Doc. No. 36 at 715.)  Banning then stepped a few feet inside Simpson's home with his natural gas meter.  (*Id.* at 703.)  The meter did not register the presence of natural gas.  (*Id.*)  EFD then stepped away from the entrance until the Officers completed a sweep of the house.  (*Id.* at 717.)

The Officers first announced their presence while standing near the threshold of the backdoor.  (Doc. No. 27-1 at 386; Doc. No. 33 at 600; Doc. No. 30 at 441.)  Hearing no response, Officers Mauser, Linder, Rivera, and Thirion slowly entered Simpson's residence. (*Id.*)  The Officers entered with firearms in the "low-ready" position.  (Doc. No. 31 at 493; Doc. No. 30 at 441.)

Officer Rivera immediately noticed a camera inside the residence and appearing capable of monitoring activity inside the home.  (Doc. No. 31 at 488; Doc. No. 30 at 445; Doc. No. 33 at 604.)  Officer Thirion placed a piece of clothing on the camera to obscure the view of anyone who could be watching their approach.  (Doc. No. 31 at 490-91; Doc. No. 30 at 445.)  The

Officers continually announced their presence as they made their way throughout the house. (Doc. No. 30 at 445-46; Doc. No. 31 at 491.)

After clearing the first floor, some of the Officers went to the second floor.  (Doc. No. 32 at 544; Doc. No. 30 at 445-46.)  There, Officer Mauser discovered Simpson in his bedroom. (Doc. No. 32 at 546; Simpson Dep., Doc. No. 37 at 743.)  Officer Mauser immediately stepped away from the bedroom door.  (Doc. No. 32 at 549.)  According to Simpson, he awoke and became aware of the Officers in his hallway.  (Doc. No. 37 at 742-43.)  Still in the hallway, the Officers ordered Simpson to put his hands up, turn around 360 degrees, and walk backwards towards them.  (Doc. No. 37 at 743; Doc. No. 32 at 549.)  Simpson was clothed only in boxer briefs.  (Doc. No. 37 at 744.)  Simpson complied with the Officers' orders and came out of his bedroom.  (Doc. No. 32 at 549-50; Doc. No. 37 at 743.)

Some of the Officers entered his room.  (Doc. No. 37 at 744-43.)  The other Officers, with weapons now fully lowered or re-holstered,[5] told Simpson about the natural gas smell and active water leak.  (*Id.* at 745.)  Having confirmed no firearms were readily available in the bedroom, Simpson returned to his room and put on clothes.  (*Id.*)  He then headed to the basement.  (Doc. No. 27-5 at 410-11.)  Once there, he was told that EFD discovered that a broken refrigeration pipe was the source of the water leak.  (Doc. No. 27-5 at 412; Doc. No. 36 at 719.)  The water supply valve was then turned off.  (Doc. No. 37 at 748; Doc. No. 36 at 719.) Before leaving, the Officers told Simpson that he would need to get his door fixed.  (Doc. No. 37 at 748.)

---

[5] The officer carrying the rifle pointed the firearm directly to the ground.  (Doc. No. 33 at 611.) The officers with holstered service weapons re-holstered their weapons.  (*Id.*)

EPD never made physical contact with Simpson.  (*Id.* at 744.)  EFD and EPD went into Simpson's home without donning additional protective gear to protect themselves from a potential natural gas leak.  (Doc. No. 36 at 721.)  EFD could have turned off Simpson's natural gas supply from outside of his residence, but only after they first identified the source of the leak. (*Id.* at 701.)

### B.  Procedural Background

Simpson filed this lawsuit on November 2, 2020.  (Doc. No. 1.)  Defendants answered and moved for judgment on the pleadings.  (Doc. Nos. 4 & 11.)  Simpson amended his complaint and sought relief under § 1983 for violations of the Fourth Amendment, including unlawful search, use of excessive force, unlawful seizure, failure to intervene, and supervisor liability claims.  (Doc. No. 14.)  He also raised claims under Ohio law for false arrest, assault, battery, intentional infliction of emotional distress, and willful, wanton, and reckless conduct.  (*Id.*)  The Court denied the motion for judgment on the pleadings as moot.  (Doc. No. 20.)  Defendants timely moved for summary judgment on all counts in Simpson's amended complaint.  (Doc. Nos. 14 & 27.)

## II. Discussion

### A.  Standard of Review

A motion for summary judgment must be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to a jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law."  *Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 630 (6th Cir. 2014) (citing *Anderson*, 447 U.S. at 255.)

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint."  *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991).  Put another way, the party opposing the motion for summary judgment must present evidence supporting his claims.  *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex*, 477 U.S. at 322 ("Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.").  Thus, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871 (1990); *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) ("A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant.").  Rule 56 further provides that "[t]he

8

court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

### B.  Constitutional Claims Overview

#### 1. § 1983

Simpson's first five claims were brought under 42 U.S.C. § 1983.  (Doc. No. 14 at 130-35.)  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  There is no dispute the Defendants were acting under color of state law while performing the allegedly unlawful acts at issue in Simpson's complaint.

#### 2. Qualified Immunity

The critical dispute is whether Defendants are entitled to qualified immunity.  "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)) (brackets and internal quotations omitted); *see also Pearson v. Callahan,* 555 U.S. 223, 232 (2009).  Qualified immunity provides "breathing room [to officers who] make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (cleaned up) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731.  Courts must

evaluate "the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight."  *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007).

In sum, qualified immunity hinges on: (1) whether there was a violation of a constitutional right, and (2) was that right clearly established at the time of the incident.  *Saucier v. Katz*, 533 U.S. 194, 207-08 (2001).

The Supreme Court has –

repeatedly told courts not to define clearly established law at too high a level of generality.  It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Such specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine [] will apply to the factual situation the officer confronts.

*City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11-12 (2021) (cleaned up).

Certainly, some instances of police conduct are so clearly and obviously wrong that citations to specific case law is not necessary.  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).  But where an officer's conduct is not so plainly afoul of constitutional principles, the plaintiff "must identify a case that puts [the officer] on notice that his specific conduct was unlawful."  *Id.*

As an initial matter, there is no factual dispute that Defendants were acting within their discretionary authority, as Ohio courts recognize that police officer discretion extends to assisting firefighters.  *See State v. Luong*, 977 N.E.2d 1075, 1082 (Ohio Ct. App. 2012) (holding officers could lawfully assist firefighters who detected gas odor in home conduct a search); *see also Smith v. McBride*, 955 N.E.2d 954, 961-64 (Ohio 2011) (discussing police officer's professional obligation to render assistance to other officers outside their jurisdiction).

10

What remains for the Court to determine is whether the facts, taken in a light most favorable to Simpson, indicate that Defendants' conduct (1) violated a constitutional right, and (2) such right was clearly established at the time of the violation.  *E.g.*, *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014).  The Court addresses each of Simpson's Fourth Amendment claims in turn.

### 3. Failure to Specify Offending Officers

To begin, the Court notes that Simpson brought the unlawful search, use of excessive force, and false arrest claim against all Defendants, the failure to intervene claim against the Officers, and the supervisor liability claim against Lt. Holden.  (Doc. No. 14 at 133-36.)  In opposition to summary judgment, Simpson failed to clarify the specific conduct of each Defendant, let alone that any Defendants' conduct violated a clearly established constitutional right.  Thus, Simpson has not refuted each Defendants' assertion of qualified immunity.  *E.g.*, *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (noting that qualified immunity must be evaluated for each police officer separately); *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (stating that the plaintiff "must show that *the official* violated a right so clearly established" and that "[t]he plaintiff bears the ultimate burden of proof to show *that the individual officers* are not entitled to qualified immunity.") (emphasis added) (quotations and citations omitted)); *see also Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005).

Nonetheless, the Court considers whether any of the Officers violated the Fourth Amendment with respect to Counts One through Four, which address unlawful search, use of excessive force, unlawful seizure, and failure to intervene.  The Court only considers Lt. Holden's liability with respect to the supervisor liability claim in Count Five, as the record indicates Lt. Holden was not present at Simpson's home at any time relevant to this case.

11

### C.  Unlawful Search

The Fourth Amendment states "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Kyllo v. United States*, 533 U.S. 27, 31 (2001).  "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  *Id.* (quotation marks omitted).  Because of this, "[i]t is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quotations omitted).  But the Supreme Court has "also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness."  *Id.* (quotation marks omitted).  "Accordingly, the warrant requirement is subject to certain reasonable exceptions."  *Id.*

Warrantless entry into someone's home is justified when there are exigent circumstances. *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003).  This exception applies if the "facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed."  *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002).  While there is not an exhaustive list of circumstances that give rise to such a belief, courts have articulated four scenarios that most often qualify as "exigent": (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to police or others.[6]  *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003); *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996).

---

[6] The Court must decide whether EPD – not EFD – could lawfully enter Simpson's home absent a warrant because EFD firefighters are not named defendants in this case.  Simpson pointed out that EFD did not have protective gear to bolster his assertion that the "firefighters on scene did

12

That a warrantless search of the duplex occurred is not disputed.  The dispute is whether this situation permitted warrantless action.

The Officers primarily relied on two Sixth Circuit cases finding that exigent circumstances justified a warrantless search: *Rohrig* and *Thacker*.  (Doc. No. 27 at 352-55.)

In *Rohrig*, the court found that the exigent circumstances exception applied to a warrantless entry resolving a noise complaint in the middle of the night.  98 F.3d at 1521, 1525.  The court analyzed Supreme Court precedent and noted that there was often a sufficient "risk of danger" to justify a warrantless entry when "the Government [was] acting in something other than a traditional law enforcement capacity."  *Id.* at 1516.  Although the court recognized that abating excessive noise did not "neatly" fit into the "risk of danger" category (or any other established exigent circumstances category), the court held that the warrantless entry was constitutional under the exigent circumstances exception.  *Id.* at 1519, 1525.  That conclusion rested on two distinct findings: (1) the officers did not enter in order to perform a more traditional law enforcement function, such as questioning suspects or obtaining evidence for prosecution; and (2) the need to abate the nuisance was urgent, as the noise was blaring in the middle of the night, leaving the neighbors "irate" and unable to sleep.  *Id.* at 1521.  The court

---

not believe there was any imminent danger to either Simpson's home or any individual."  (Doc. No. 38 at 784.)  Simpson further noted that "[i]n [Banning's] discussions with the platoon chief, Banning gave no consideration to whether there was a legal justification [for] forcing entry into [his] home."  (*Id.*)  But Simpson failed to articulate how EFD's lack of protective gear and discussion on legality impacts whether the Officers' warrantless entry was permissible.  To the extent that one can use these facts to make an adverse inference against the Officers, it is insufficient to raise a genuine dispute on the issue of whether the Officers reasonably believed EFD thought a forced entry was necessary.  The undisputed facts show that the Officers witnessed EFD decide that immediate entry was necessary.  Moreover, the Officers made it clear that it was EFD's call to make on whether the circumstances warranted a forced entry.

concluded that the "right to be left alone" was diminished when it meant leaving homeowners alone to "project[] loud noises . . . in the wee hours of the morning." *Id.* at 1522.

In *Thacker*, police officers were dispatched to an apartment for what they believed to be an attempted suicide.  328 F.3d at 249.  Paramedics were already there.  *Id.*  The officers observed a highly intoxicated man with a severe cut on his wrists.  *Id.*  A paramedic said that they would not render aid until the police assured them it was safe to do so.  *Id.* at 254.  The officers went into the home without a warrant.  *Id.*  In analyzing exigent circumstances, the court highlighted that (1) the paramedics were required to immediately render aid, and (2) warrantless entry was necessary to ensure the paramedics' safety.  *Id.*

Simpson argued that *Rohrig* and *Thacker* do not apply because the exigency was manufactured (i.e., claiming a gas leak), and manufactured exigency does not justify warrantless entry.  (Doc. No. 38 at 793.)  Simpson directed the Court's attention to *United States v. Williams*, 354 F.3d 497 (6th Cir. 2003), where a landlord reported a suspected water leak in a rented home to the Drug Enforcement Administration ("DEA") agents.  *Id.* at 500.  The landlord stated that the water bills were "higher than normal" and there had been a water leak some five years earlier.  *Id.*  The landlord first traveled to the property alone and inspected the living room and kitchen.  *Id.*  She found no evidence of a leak.  *Id.*  She did, however, notice an "odd" smell.  *Id.*  But, because it was dark and she was afraid, the landlord left without walking through the entire home.  *Id.*  The landlord asked DEA agents to return with her and look through the property.  *Id.*  They did, and one of the agents entered the property without a warrant.  *Id.* at 500-01.  The agents had no reason to believe anyone was in the home before they entered.  *Id.* at 501.

The Sixth Circuit held that the exigent circumstances exception did not apply.  *Id.* at 509.  Time was not of the essence.  *Id.* at 504.  The landlord waited weeks to inspect the house after

receiving the water bills. *Id.* The agents did not believe any person was present or at risk. *Id.* at 501. And, given that the landlord had not seen water damage in her first go around, the potential hazard was slow, speculative, and solely a risk of property damage. *Id.* at 505. Any immediate risk of danger was created by the entry itself. *Id.*

The Officers' search here is more analogous to the *Rohrig* and *Thacker* searches than the search evaluated in *Williams* for the following three reasons.

*First*, Simpson's argument that the Officers "created their own exigent circumstances" is not supported by the record. (Doc. No. 38 at 793.) It is undisputed that EFD, not the Officers, were the ones who initially determined that it was necessary to enter Simpson's home. (Doc. No. 27-1 at 381-82; Doc. No. 16-1 at 161; Doc. No. 33 at 596-97.) *Williams* does not support the proposition that police officers would be "creating their exigent circumstances" when other first responders – i.e., not private citizens – determine that immediate entry is warranted. Simpson's reading of *Williams* is especially troublesome, given that the Sixth Circuit decided *Thacker* the same year and did not conclude that those officers were "creating their own exigent circumstances" by assisting the paramedics.[7] The distinction between a concerned landlord and emergency responders is obvious.

*Second*, like the *Rohrig* and *Thacker* officers, the Officers were not performing a traditional law enforcement role. It is undisputed that the Officers arrived because EFD requested their presence. (*E.g.*, Doc. No. 16-1 at 162.) While at Simpson's home, the Officers

---

[7] Simpson argued that *Williams* "amended and superseded" *Thacker*. (Doc. No. 38 at 797.) Not so. To start, *Williams* cites *Thacker* when discussing the exigent circumstances exception. *Williams*, 354 F.3d 497. Moreover, the *Williams* court found that the officers "manufactur[ed] exigent circumstances" because – unlike the *Thacker* officers – the agents knew no one was in the house with the potential leak, and thus no person was in any danger. *Id.* at 501, 504.

performed no role other than assisting the EFD.  The Officers first helped EFD attempt to contact Simpson.  (Doc. No. 27-4 at 403; Doc. No. 32 at 534.)  Unable to reach Simpson, the Officers deferred to EFD on whether it was necessary to force entry into Simpson's property.  (Doc. No. 27-1 at 381-82; Doc. No. 16-1 at 161.)  After EFD decided it was, the Officers – upon EFD's request – performed a sweep of the property to ensure it was safe to enter.[8]  (Doc. No. 33 at 597-98; Doc. No. 27-1 at 385.)  Simpson did not point to anything in the record that established that the Officers' objectives ever diverged from making sure EFD were able to safely (1) fix the water leak, (2) discover the source of the natural gas odor, and (3) ultimately make sure Simpson and his neighbors were safe.  Assisting and protecting other public servants is not a traditional law enforcement function.  *See Rohrig*, 98 F.3d at 1521; *Thacker*, 328 F.3d at 253.

*Third*, unlike in *Williams*, the Officers were confronted with a situation that reasonably required "exigent" action.  Simpson's reliance on *Williams* hinges on the Officers' testimony that "exigent circumstances" did not exist for them.  But, by isolating this fact, Simpson oversimplified the totality of the circumstances presented.  (Doc. No. 30 at 437; Doc. No. 33 at 594.)  EFD knew Simpson was home and not responding.  (Doc. No. 27-2 at 389.)  EFD had confirmed an active water intrusion and suspected a natural gas leak.  (*Id.* at 390.)  Fearing for Simpson and his neighbors' safety, EFD determined a warrantless entry was necessary.  (*Id.*)  Concern for the nonresponsive Simpson is supported by Banning's preemptive call for an ambulance.  (Doc. No. 27-1 at 382.)  Not knowing what awaited them inside, EFD asked the

---

[8] The Court notes that Simpson's opposition brief highlighted that it is undisputed that EFD could have shut off the natural gas source from outside of the duplex.  Although this may be true, it fails to raise a genuine dispute for two reasons.  First, nothing in the record shows that EPD had such an ability.  Second, Banning's testimony clarifies EFD would have to first "find the source [and] identify the need to shut off a gas meter" before shutting it off from the outside.  (Doc. No. 36 at 701.)

Officers to make the initial entry and ensure EFD's safety.  (Doc. No. 27-2 at 390; Doc. No. 27-1 at 385; Doc. No. 33 at 597-98.)

From the Officers' perspective, their assistance was requested by other first responders – with experience, specialized knowledge, and training for these situations – who determined that Simpson and others might be in danger.  (Doc. No. 33 at 594.)  It was reasonable for the Officers to conclude that there was an immediate need to assist EFD by making the initial entry into the house.  *See Thacker*, 328 F.3d at 254-55.  Essentially, Simpson is asking this Court to find that the Officers could not credit EFD's conclusion that a suspected natural gas leak and active water intrusion presented the potential for imminent danger not only to Simpson, who was known to be in the home and not responding, but also to Simpson's neighbors.  (Doc. No. 27-1 at 370-72; Doc. No. 32 at 534; Doc. No. 33 at 589.)  But he cited no authority establishing that police officers must discredit observations made by firefighters on issues firefighters are specifically trained to address.

Although not cited by Defendants, *Johnson v. City of Memphis*, 617 F.3d 864 (6th Cir. 2010) also guides this Court's reasoning that the Officers' search was justified under the exigent circumstances exception.  In *Johnson*, the police were dispatched to investigate a "911 hang call."  A hang call is when the caller dials 911, hangs up before speaking with the operator, and the operator is unsuccessful in trying to return the call.  617 F.3d at 866.  When they arrived, the officers attempted to communicate with the occupant through an already opened door.  *Id.*  There was no response.  *Id.*  The officers then entered the residence with their guns drawn.  *Id.*  The court held that "the combination of a 911 hang call, an unanswered return call, and an open door with no response from within the residence is sufficient to satisfy the exigency requirement."  *Id.* at 869.  More specifically, the court determined that the exigent circumstances exception applied

17

because "the police were justified in entering the home to sweep for a person in need of immediate assistance under the emergency aid exception." *Id.* at 868-69 (referencing *Brigham City v. Stuart*, 547 U.S. 398 (2006), which held that the exigent circumstances exception applied when an officer entered a home to break up an ongoing fight and render aid). Using *Johnson*'s logic, "the combination of" the ongoing water intrusion, suspected natural gas leak, inability to communicate with Simpson when they knew Simpson was home, and EFD's determination that the Officers' entry was necessary to secure the scene for EFD, was "sufficient to satisfy the exigency requirement." *See id.*

The Officers' warrantless entry into Simpson's home was lawful under the exigent circumstances exception.[9] The Officers reasonably believed that their immediate entry into Simpson's home was necessary to address the pressing safety concerns of Simpson, Simpson's neighbors, and EFD. *Thacker*, 328 F.3d at 244-55; *Johnson*, 617 F.3d at 869; *Rohrig*, 98 F.3d at 1516. Simpson's Fourth Amendment unlawful search claim fails on the merits. Accordingly, Defendants' motion is granted as it relates to Count One.

### D. Excessive Force

#### 1. Legal Standard

The success of an excessive force claim depends on whether the officer's conduct is "objectively reasonable" in light of the existing facts and circumstances. *Graham v. Connor*,

---

[9] Even if the Court were to disregard binding caselaw and find that the Officers' search was not lawful, the Court must still grant summary judgment unless Simpson shows that the illegality of the search was clearly established at the time it was conducted. Simpson relied on *Williams* for this point. (Doc. No. 38 at 798.) As explained herein, *Williams* is too dissimilar to the facts here to give the Officers a "fair and clear warning" that their entry was unlawful. *Hopper v. Plummer,* 887 F.3d 744, 755 (6th Cir. 2018). And relying on *Williams* to conclude that unlawfulness was clearly established would ignore the Supreme Court's admonition in *Bond* that district courts may not evaluate the "clearly established" prong too broadly. 142 S. Ct. at 11-12.

490 U.S. 386, 397 (1989).  Whether an action was objectively reasonable requires a "fact-specific, case-by-case" inquiry focused on "whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene."  *Marcilis v. Twp. of Redford*, 693 F.3d 589, 598 (6th Cir. 2012) (quoting *Cohran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011)).  The court's analysis must allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.

### 2. Facts available to Officers and Chosen Use of Force

The Officers arrived at Simpson's house to resolve a domestic dispute and water leak.[10] (Doc. No. 32 at 516-18; Doc. No. 27-2 at 389.)  After they arrived, the Officers attempted to knock on Simpson's doors and contact the vehicles' owners located in his driveway.  (Doc. No. 27-4 at 403; Doc. No. 33 at 589-90.)  The Officers received no responses.  (Doc. No. 33 at 589-90.)  While knocking on Simpson's backdoor, the Officers and EFD noticed the smell of natural gas.  (Doc. No. 27-1 at 376-77.)  EFD concluded that it was necessary to immediately force entry into Simpson's residence and investigate the situation.  (*Id.* at PageID 381-82.)  But EFD said they would not enter the home without the Officers first performing a protective sweep.  (*Id.* at PageID 385.)  The Officers agreed to aid in entry and securing the home.  (Doc. No. 33 at 596-

---

[10] The parties dispute what EFD told the Officers when the Officers arrived at the scene.  Some of the Officers claimed EFD told them they heard people arguing inside Simpson's residence. (Doc. No. 30 at 432.)  The only EFD testimony on this point was from Banning.  Banning denied providing such information.  (Doc. No. 36 at 723.)  The only undisputed evidence on this point is the fact that dispatch notified EPD that they were needed at Simpson's house to help resolve a "possible domestic issue."  (Doc. No. 27-2 389.)  Accordingly, the Court considers that the Officers were dispatched to address a domestic issue but does not consider the Officers' testimony that EFD provided additional information about a domestic issue upon their arrival.

97.)  EFD opened the door, and the Officers announced their presence.  (Doc. No. 27-1 at 386;

Doc. No. 30 at 441-42.)  And still no response.  (*Id.*)  Immediately upon entering the home, the

Officers noticed an inward-facing camera – one pointed at them – that could be used to observe

them and track their movements.  (Doc. No. 30 at 445.)  Officer Thirion testified that the camera

caused him to become "[s]cared of getting ambushed."  (Doc. No. 30 at 490.)

Confronted with these facts, the Officers conducted a protective sweep with weapons in a

low-ready position.[11]  (Doc. No. 31 at 493; Doc. No. 30 at 441.)  When they discovered Simpson

in his bedroom, the Officers – still with their weapons in low-ready positions – ordered Simpson

to come out of the room with his hands up.  (Doc. No. 33 at 610; Doc. No. 32 at 549.)  Simpson

complied with these orders, and the Officers' weapons were lowered further or returned to their

holsters.  (Doc. No. 37 at 744; Doc. No. 33 at 611.)  The Officers never made physical contact

with Simpson.  (Doc. No. 37 at 744.)  The Officers then explained why they were present and

that Simpson was needed in the basement to assist with identifying the source of the natural gas

odor and water leak.  (Doc. No. 37 at 745.)

### 3. Analysis

Simpson claimed excessive force was used because weapons were drawn and that this

use of force caused him fear and emotional distress.  (Doc. No. 38 at 795.)

The facts here do not reasonably suggest that the Officers' conduct was unconstitutional.

"Officers may point their weapons at an individual whom they honestly, even if mistakenly,

believe to be dangerous."  *Meyers v. Mitrovich*, No. 1:14-cv-1604, 2015 WL 413804, at *12

---

[11] None of the parties define low-ready.  In a Sixth Circuit opinion it was defined as the weapon being "pointed at approximately forty-five degrees toward the ground."  *United States v. Saari*, 272 F.3d 804, 806 (6th Cir. 2001).  In a Southern District of Ohio opinion, low-ready was defined as the weapon being only "partially raised."  *Sherrod v. Williams*, No. 3:14-CV-454, 2019 WL 267175, at *9 n.5 (S.D. Ohio Jan. 15, 2019).

(N.D. Ohio Jan. 30, 2015); *see also Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (recognizing that police are not entitled to point their guns at citizens when there is no hint of danger, but they are allowed to do so when there is reason to fear danger).  Thus, "the threatened use of a weapon must be predicated on at least a perceived risk of injury or danger to the officer or others[] based upon what the officer knew at that time." *Meyers*, 2015 WL 413804, at *12. Indeed, this is entirely consistent with an officer's obligation to use force, as reasonably necessary, to prevent potentially violent situations and protect themselves.  *See Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir. 1989) (citing *Hinojosa v. Terrell*, 834 F.2d 1223, 1231 (5th Cir. 1988).

   In the Sixth Circuit, an officer's display of a weapon may be excessive if at the time force was used the officer had readily determined that there was no risk of danger or flight.[12]  *Davis v. Bergeon*, 187 F.3d 635, 1999 WL 591448, at *5 (6th Cir. 1999) (table); *Binay v. Bettendorf*, 601 F.3d 640, 644, 650 (6th Cir. 2010); *Wright v. City of Euclid*, 962 F.3d 852, 861, 865 (6th Cir. 2020).  The question then becomes when did the Officers determine that there was no risk of danger.

---

[12] Notably, there are call outs and law enforcement functions that are known to present a substantial risk to responding officers because the environment is so fluid.  Suspected domestic incidents, like this, are one of them.  *See, e.g.*, *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 609 (6th Cir. 2020) (discussing how responding to a domestic violence call can lead an officer to believe that they are being called to investigate a serious crime).  Protective sweeps are another.  *See, e.g.*, *Hollins v. City of New York*, 2014 WL 836950, at *9 (S.D.N.Y. Mar. 3, 2014) ("Because police officers have a legitimate safety concern when initially sweeping and securing a residence during the execution of a search warrant, it was objectively reasonable for Defendants to place the Plaintiff at gunpoint while effectuating the search warrant."); *United States v. Holland*, 522 F. App'x 265, 270, 275-76 (6th Cir. 2013) (finding officers lawfully performed a protective sweep).

The cases Simpson cited to support his excessive force claim are too distinguishable to be persuasive.[13]  In *Baird*, the Seventh Circuit held that using a 9-millimeter submachine gun to detain a store full of people for two hours when there was no suggestion of danger constituted an excessive use of force.  576 F.3d at 343.  In *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005), *overruled by United States v. King*, 687 F.3d 1189 (9th Cir. 2012), officers pointing weapons at an infant for an extended period was excessive.  In *Holland ex rel. Overdorff  v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001), SWAT members violated the Fourth Amendment when they continuously displayed and pointed firearms at children.  And in *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995), the officers continued use of guns and handcuffs on a mother and her 15- and 17-year-old children – when there was no evidence of a threat to the officers or others – was found to be unreasonable.

In this instance, Officers responded to a domestic incident dispatch.  Upon arrival, EFD confirmed an active water leak originating from Simpson's residence and cascading down and pooling on his duplex-neighbor's basement floor.  The Officers confirmed Simpson's home was occupied.  The Officers tried to contact Simpson.  They tried to contact the owner of the vehicle parked in the driveway.  All efforts were unsuccessful.  Taking together what was known to all first responders at the time – an active water leak, the suspected smell of natural gas, and a non-responsive occupant – the original decision to investigate further, secure the home, and ensure

---

[13] For obvious reasons, these cases did not give Defendants a "fair and clear warning" that their use of force was excessive.  *Hopper,* 887 F.3d at 755; *see also Rivas*-Villegas, 142 S. Ct. at 8 (exploring qualified immunity's "clearly established" prong in the context of excessive force claim).  Therefore, even if this Court were to have found that the Officers' use of force was excessive, his excessive force claim would have still been dismissed under the second qualified immunity prong.

22

the safety of EFD and any occupants was reasonable.  As was the decision to enter the home in weapons in low-ready position.

Observations made in the home, including Simpson's lack of responsiveness and the inward-facing camera, justified the Officers' decision to approach Simpson with their weapons in the low-ready position.  This use of force was not excessive.  That no danger was actually present was not known to the Officers until *after* Simpson complied with their orders.  When the Officers knew that Simpson presented no danger to them or others, the Officers put their weapons away.  Their use of force terminated when they confirmed that Simpson did not pose a threat.  This is consistent with what the Fourth Amendment allows.  Thus, the Court grants Defendants' summary judgment motion as it relates to Count Two.

### E.  False Arrest

Count III of the amended complaint is labeled "False Arrest."  In his opposition brief, however, Simpson stated that this count asserts a Fourth Amendment violation for the alleged unlawful seizure outside of his bedroom. [14]  (Doc. No. 14 at 133; Doc. No. 38.)

Under the Fourth Amendment, encounters become seizures when a person's freedom of movement is limited "by means of physical force or a show of authority."  *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  In other words, a person is seized when a reasonable person would not believe they were free to leave or disregard the officer's requests. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004).  A person is not seized for Fourth Amendment purposes until they submit to the officer's show of authority.  *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010).

---

[14] It is unclear to this Court why Simpson labeled this claim "false arrest" and then cited caselaw discussing when seizures violate the Fourth Amendment that did not amount to a formal arrest.

Simpson was seized when the Officers, with weapons displayed, ordered him to come out of his bedroom. *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021) ("Examples of circumstances that indicate a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980))). Simpson submitted to the Officers' show of authority by complying with the command. (Doc. No. 32 at 549-50; Doc. No. 37 at 743.) None of this is disputed.

Seizure alone is insufficient to prevail on this claim. In *Terry*, the Court announced that a "reasonable search for weapons for the protection of the police, where [the officer] has reason to believe that he is dealing with an armed and dangerous individual" is permitted, "regardless of whether [the officer] has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). For this type of search or seizure not to offend the Fourth Amendment, (1) the officer must have reasonable suspicion supported by articulable facts that the individual may have weapons or is otherwise engaging in criminal activity, and (2) the detainment must last no longer than necessary to effectuate the purpose of the seizure. *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Florida v. Royer*, 460 U.S. 491, 500 (1983).

The Court has already determined the Officers had a reasonable, articulable basis to conclude that Simpson may be dangerous or engaged in criminal activity. The dispatch officer told them they were responding to a potential domestic dispute. (*E.g.*, Doc. No. 32 at 517-16.) Once there, additional facts became known to them: an ongoing water leak, a suspected natural gas leak, an unresponsive occupant, and an internal, doorway-facing camera capable of monitoring the Officers' movements. All these factors, when taken together, supported a

24

reasonable suspicion that justified the Officers' decision to direct Simpson to come out of his bedroom.  The next question is whether that detention lasted longer than necessary.  *Royer*, 460 U.S. at 500.  The facts here demonstrate that it lasted only so long as reasonably necessary for them to determine that there was no ongoing criminal activity or threat to them.  As soon as Simpson complied with the Officers' orders, they put their guns away.  (Doc. No. 37 at 745.) Simpson then went back into his room, got dressed, and went to the basement to speak with EFD.  (Doc. No. 27-5 at 411.)  The seizure did not run afoul of the Fourth Amendment. Summary judgment is granted for Defendants on Count Three.

### F.  Failure to Intervene

A failure to intervene claim is predicated on an underlying violation of law.  *Hunt v. Sunquist*, 822 F. App'x 468, 479 (6th Cir. 2020) (affirming a district court's grant of summary judgment on failure to intervene claim because an officer cannot be held liable for failing to prevent unlawful conduct that never occurred).  As discussed above, the Court has determined that the Officers did not violate Simpson's Fourth Amendment rights.  Accordingly, this claim fails as a matter of law.  Summary judgement is granted for Defendants on Count Four.

### G.  Supervisory Liability

For his last § 1983 claim, Simpson asserted that Lt. Holden is liable for directing the Officers' unlawful search, seizure, and use of excessive force.  (Doc. No. 14 at 134.)  Supervisor liability claims require plaintiffs to "show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020) (quotation marks and citations omitted).  Again, the Court has determined that the Officers did not violate Simpson's Fourth Amendment rights.  Thus, Lt. Holden cannot be liable under a supervisor

liability theory of liability.  This claim fails as a matter of law.  Defendants' motion is granted as it relates to Count Five.

### H.  Ohio Law Claims

Simpson alleged the following claims under Ohio law against the Defendants:

- Count Six: False Arrest;

- Count Seven: Assault and Battery (only against the Officers);

- Count Eight: Intentional Infliction of Emotional Distress; and

- Count Nine: Willful, Wanton, and Reckless Conduct.

(Doc. No. 14 at 134-37.)

Ohio law immunizes officer conduct unless that conduct is "outside the scope of [their] employment or official responsibilities" or "[with] malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(A)(6).[15]

When a court determines that an officer's search, seizure, or use of force was conducted within his scope of employment and was objectively reasonable under the circumstances, the court must also find that the officer's conduct was not malicious, reckless, or done in bad faith. *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009) ("Inasmuch as plaintiff has failed to demonstrate that defendants' conduct was objectively unreasonable, it follows that she

---

[15] "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F.Supp.2d 612, 629 (S.D. Ohio 2004) (quotations and citations omitted).  "Bad Faith includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.* (quotations and citations omitted).  "[R]ecklessness is conduct characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quotations and citations omitted).  "Wanton misconduct is the failure to exercise any care toward those to who a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 134 983 N.E.2d 266, 273 (Ohio 2012).

has also failed to demonstrate that defendants acted with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' such as is required to avoid statutory immunity under Ohio law.").

Again, the Court has determined that the Officers' decisions – made within the scope of their employment – to enter Simpson's home and temporarily restrict his movement with service weapons drawn did not violate the Fourth Amendment because those decisions were "objectively reasonable" under the circumstances.  Accordingly, the Officers are immune from any state law liability under § 2744.03(A)(6), and all state law claims are dismissed.  Summary judgment is granted for Defendants on Counts Six through Nine.

**III.  <u>Conclusion</u>**

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. (Doc. No. 27.)  This case is dismissed.


**IT IS SO ORDERED.**

Date: March 21, 2023

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE